## OTIS M. WHEELER v. WILLIAM HOLLIS, GUARDIAN.

Where there was an omission in the statement of facts, caused by the loss of a paper by the appellant's attorney, the Court said, if it were uncertain what the evidence was, and we could not certainly know that its presence in the statement of facts would not affect our opinion of the case, the objection (that the appellant could not claim a revision of the judgment, upon a defective statement of facts,) would be entitled to weight. But as our opinion proceeds on grounds which render the evidence immaterial, giving the appellee the benefit of everything it can be supposed to contain, we do not think its loss should deprive the appellant of the right to have the judgment revised.

In this case it was held that the immigration of a guardian from the State of Mississippi to this State, and his emigration hence to Arkansas, his ward, who was the child of his wife by a former husband, going along as part of the family, would operate a change of domicil of the ward, corresponding to the changes of domicil of the guardian and mother, in the absence of proof that the change was injurious to the interests of the ward, or was intended by the guardian to affect the descent of the ward's property in case of her death.

The facts that a guardian immigrated from Mississippi to Texas to avoid the payment of his debts, and that he left his guardianship unsettled, bringing with him his ward and her property, would not be sufficient in themselves to prevent a change of the ward's domicil, on the ground of injury to the ward or fraud upon her prospective heirs; although they would be circumstances proper for the consideration of the jury in determining on the intention of the guardian's removal, and its effect upon the interests of the ward.

Appeal from San Augustine. Tried below before the Hon. William W. Morris.

Charles Hamilton and Mary Jane, his wife, residing in Mississippi, the former died before the year 1830, and the latter gave birth soon afterwards to a daughter who was called Elizabeth. Elizabeth was the owner of slaves in right of her father. Afterwards Mary Jane, the mother, married Harrison E. Watson. The latter became the guardian of Elizabeth, and received her property into his possession. In 1834 or 1835, Harrison E. Watson removed with his wife and ward to Texas. A witness for plaintiff stated that Watson removed from Mississippi to Texas to escape from his debts. The plaintiff gave in evidence " a record of the probate Court of Claiborne county, State of Mississippi, being the inventory of Harrison E. Watson, as guardian of Elizabeth Hamilton ; " but at the place in the statement of facts, for its insertion, was a certificate by the Clerk that it had been taken out by the attorney for the appellant, James M. Ardrey, to prepare his brief, and had not been returned. The witnesses spoke of three slaves belonging to Elizabeth Hamilton. In the latter part of 1839, or beginning of 1840, Watson, in the language of plaintiff's witness, ran away from San Augustine county, Texas, to Hempstead county, in the State of Arkansas, on account of embarrassment. About 1841 Elizabeth, the ward and step-daughter of Watson, died in Arkansas, intestate, under age and unmarried. In 1847 or 1848, Mary Jane, the wife of said Watson, and mother of Elizabeth, died, whether in Arkansas or Texas did not appear. Watson again returned to Texas, and in 1850 sold the slaves now in controversy, which had belonged to the said Elizabeth, to the appellant, as was proved by said Watson's bill of sale to appellant ; but in the language of the statement of facts, there was no proof of any consideration. The plaintiff's wards were the half brother and sisters of the said Elizabeth, being the issue of the marriage of her mother with the said Harrison E. Watson. It

was proved that by the law of descents of Mississippi, real and personal estate descended first to children ; in default of these or their descendants, to brothers and sisters ; in default of these or their descents, to the father ; then to the mother ; and no distinction between brothers and sisters of the whole and half blood.

It was proved that by the law of descents of the State of Arkansas, real and personal estate descended first to the children ; in default of these, or their descendants, to the father ; then to the mother ; if neither father nor mother, then to brothers and sisters. It was also proved that on the 27th of November, 1839, the Common Law of England was adopted by the Legislature of the State of Arkansas, as the rule of decision for determining the rights of parties to property and marital rights.

The Court charged the jury as follows : If the jury should believe from the evidence, that Elizabeth Hamilton, the minor, was domiciliated in the State of Mississippi, and that Harrison E. Watson there became the guardian of her property by authority of the Probate Court of Claiborne county in the State of Mississippi, and afterwards left the State of Mississippi, to avoid the payment of his debts, together with his wife and said ward, her daughter, carrying with him the property of said Elizabeth Hamilton, to the State of Texas, without making settlement as such guardian with the Probate Court in Mississippi ; and afterwards leaving the State of Texas with his said wife and her said daughter Elizabeth, he removed to the State of Arkansas, in which State the said Elizabeth Hamilton died—I say that if you come to the conclusion that such is the proof, then the descent of the property of said Elizabeth must be governed by the laws of Mississippi, and not by the laws of Arkansas.

And afterwards at the request of the appellant. the Court gave the following charge : A guardian may change the domicil of his ward, so as to change the right of succession, if it

is done *bona fide* and without fraud. If the jury believe from the evidence, that Harrison E. Watson was the husband of Mary Jane Watson; and Elizabeth Hamilton was the daughter of Mary Jane by a former husband, and that Harrison E. Watson was the guardian of said Elizabeth, and possessed as guardian of the property in controversy in the State of Mississippi under a regular guardianship, and that said Harrison E. and his wife, in good faith, changed their residence to the Republic of Texas, and afterwards to the State of Arkansas, carrying with him the said minor Elizabeth as a part of the family, together with the property of said minor ; and that the said removal was made without any fraudulent intention of gaining any advantage to themselves or others by changing the domicil of said minor, and without any fraudulent intention of squandering or converting the same to their own use ; and if they believe that Elizabeth Hamilton died in Arkansas while a minor, the property of which she died possessed, will descend to her heirs according to the rule of descent in the State of Arkansas.

To which the Court added : But in considering the fairness of the acts of said guardian, the jury may take into consideration the fact of said guardian's leaving the State of Mississippi without settling with the Probate Court, and other facts going to show a wrongful intent, if they appear in the proof.

Verdict and judgment for the plaintiff ; motion for new trial overruled, &c.

*O M. Roberts,*[*] for appellant.

*Henderson & Jones*, for appellee.

WHEELER, J. It is objected on behalf of the appellee, that the appellant is not entitled to a revision of the judgment on the merits, because the statement of facts is imperfect. It

---

[*] This case was submitted while Judge Roberts was at the Bar.—REPS.

however appears by the statement of facts what the missing document was : and in the view we entertain of the main question in the case, nothing which it could contain,—being but an inventory rendered to the Court in Mississippi by the defendant's vendor as guardian,—could possibly have any influence upon the decision of the case. If it were uncertain what the evidence was, and we could not certainly know that its presence in the statement of facts would not affect our opinion of the case, the objection would be entitled to weight. But as our opinion proceeds on grounds which render the evidence immaterial, giving the appellee the benefit of every thing it can be supposed to contain, we do not think its loss should deprive the appellant of the right to have the judgment revised.

The main question in the case is, whether the removal of Watson and wife with his ward, Elizabeth Hamilton, from Mississippi to Texas, and hence to Arkansas, effected a change of the domicil of the ward ; for it is not questioned and is undeniable, that the law of her domicil at the time of her death must regulate the succession to her personal property. Judge Story, in his Conflict of Laws, has examined the authorities on the question, whether a guardian has the power to change the domicil of his ward from one country to another, so as to change the rule of succession to his personal property, in case of his death, at some length ; and from his citations it appears that, while there is a difference of opinion among foreign jurists, the weight of authority is in favor of the power, if the change was without fraud. There certainly is a great weight of authority in favor of such a power in the parent ; though some foreign jurists take a distinction between the case of a change of domicil by a parent, and by a guardian, and while they admit the right in the former, deny it to the latter. (Story, Con. Laws, Sec. 505 to 507, and notes.) "The same question (says Judge Story) has occurred in England ; and it was on that occasion held, that a guardian may change

the domicil of his ward, so as to affect the right of succession, if it is done *bona fide* and without fraud." (Id. Sec. 506.) The case referred to is Potinger v. Wightman, (3 Merivale's Ch. R. 67,) decided by Sir William Grant. The case was one of the first impression, it seems, at that time in England. It was argued with great learning by Sir Samuel Ramilly and Mr. Swanston in favor of the power of the guardian, who was the mother, a widow, acting *sui juris* and for her children ; and her power of effecting a change of domicil was sustained. From the opinion of the Master of the Rolls, however, it may be plainly inferred, that if it had appeared that it was with a fraudulent view to the succession of her children and wards, that the guardian had changed her abode, the decision in that case would have been different. (See this case referred to by Lord Campbell in the House of Lords in Johnstone v. Beattie, 10 Clark & Finnelly's R. 138 ; and see the opinion of Lord Cottenham to the effect that an infant may be taken out of the limits of the jurisdiction by permission of the Court of Chan- . cery ; Id. 106, same case.) Judge Story says the doctrine of the case of Potinger v. Wightman, has been recognized as the true doctrine in America. Nevertheless he questions the power of the guardian. (Con. Laws, Sec. 506 and notes.)

It is to be regretted that the question is left by the authorities in so much doubt and uncertainty. The opinions of American Courts, as far as we have seen, appear to favor the power of the guardian ; though the cases are not precisely in point to the present. (Holyoke v. Haskins, 5 Peck. R. 20 ; Cutes v. Haskins, 9 Mass. 543 ; Guier v. O'Daniel, 1 Binn. R. 349, note ; Upton v. Northbridge, 15 Mass. 239.) We will conclude our examination of authorities by reference to the opinion of Chief Justice Gibson, in School Directors v. James (2 Watts & Serg. 568.) He considers the civilians equally divided upon the question, whether a guardian or tutor stands in the place of a parent, and has the same power as a father, or mother, *sui juris*, to change the domicil of a child ; and

concludes that the English and American authorities support the affirmative, and would be amply sufficient to turn the scale of authority, " were it not for the powerful doubt thrown in on the other side by Mr. Justice Story." He thinks there are grounds for this doubt, and reasons thus : " No infant, who has a parent *sui juris*, can in the nature of things, have a separate domicil. This springs from the status of marriage, which gives rise to the institutions of families, the foundation of all the domestic happiness and virtue in the world. The nurture and education of the offspring make it indispensible that they be brought up in the bosom, and as a part of their parents' family ; without which, the father could not perform the duties he owes them, or receive from them the service that belongs to him. In every community, therefore, they are an integral part of the domestic economy ; and the family continues, for a time, to have a local habitation and a name after its surviving parent's death. The parent's domicil, therefore, is consequently and unavoidably the domicil of the child. But a ward is not naturally or necessarily a part of his guardian's family; and though the guardian may appoint the place of the ward's residence, it may be and usually is a place distinct from his own. When an infant has no parent, the law remits him to his domicil of origin, or to the last domicil of his surviving parent ; and why should this natural and wholesome relation be disturbed by the coming in of a guardian, when a change of the infant's domicil is not necessary to the accomplishment of any one purpose of the guardianship ? " But waiving the decision of the question, and granting the guardian may, for some purposes, change the ward's domicil, the Judge says, applying the law to the case then before the Court, " yet if he may not exercise the power purposely to disappoint those who would take the property by a particular rule of succession, (and nearly all agree that even a parent cannot,) how can he be allowed to exercise it so as obviously and unavoidably to injure the ward himself?" And it was on the ground here suggested, that the decision turned.

Where an infant has no parent,—the case supposed by the Judge,—there may be much force in the reasoning ; and there certainly is great justice in the sentiment, and force in the argument in support of the authority of the parent. But may not the same reasoning be applied, and with equal propriety, and force, to support the right of the surviving mother, who has married the second time, especially where the nurture and education of a daughter is concerned ? Should her marrying again deprive her of the right to have the custody, care and supervision of the education of her infant children, or them of maternal sustenance and protection ? Is it the less indispensible, (in the very appropriate language of the learned Judge,) that the infant children, daughters especially, be brought up in the bosom, and as part of the family of which the mother is one of the united head, without which she could not perform the duty she owes them, or receive from them the homage to which she is entitled ? Maternal care and instruction are not the less her duty and their right in consequence of her second marriage. They are no less a part of the domestic economy, and equally entitled to membership in her family. There can be no reason why her domicil, the domicil of her choice, should not be theirs, if she and her husband unite in making it such. When an infant has no parent, the law, it is true, remits him to his domicil of origin, or to the last domicil of his parent. But when he has a surviving mother, it is difficult to perceive the justice or propriety there would be in not permitting her to make her domicil that of her children. It may be different to some extent, in European society ; but in the society of this country, the habits and sentiments of our people, our ideas of domestic economy, would be opposed to denying the mother, upon her second marriage, the custody of her infant children. In older communities, it may not be unusual for children, who have parents, to have others appointed their guardians ; and then it may be truly said that the ward is not naturally or necessarily a part of the guardian's family ; and so it may be

said where the ward has no parent.   But in this country, it cannot be said, I apprehend, in general, where the ward has a mother, whose husband is the guardian of her child.   There may be cogent reasons why, for the benefit of her ward, the mother may wish to change her abode and that of her ward. Immigration here from our older sister States is the natural order of things'; and mothers, who have married a second time, may have as good reasons for changing the domicil of their children, for their mutual advantage, as others.   If they, or their husbands, are' the gurdians of their children, it is diffi- cult to assign any reason in support of the right of parents to change the domicil of their children, which would not apply to them, where for the mutual advantage of both parties they desired the change.   It is admitted that a widow, *sui juris*, may change the domicil of her children, she being their guar- dian.   If she should marry after making the change of domi- cil, the law would not remit the children to her former domi- cil.   Then why should their domicil be unalterably fixed by the fact of her marriage, when she may marry with a view to the same change of her place of abode, which she would have effected had she remained a widow ?   There may be more rea- son to deny the right of a guardian to change the domicil of his ward in governments which deny the right and power of expatriation, and the obligation of allegiance is held to be per- petual, than in this country, where the right of expatriation is admitted.   There doubtless is good reason and sound policy in requiring that the change be made *bona fide* and without fraud ; and holding the change ineffectual, where the guardian should change the domicil of a child who was sick, with no other apparent object than that of removing him from a place in which, according to the law of succession, the guardian would not succeed to the child's estate, to another place, which admitted the guardian to such succession.   Such a removal may be justly deemed a fraud upon those who would have suc- ceeded, if no removal had taken place.   So if the removal be

purposely to the detriment of the interest of the ward, or to enable the guardian to encumber or convert to his own use the property of his ward, it may be deemed fraudulent as to the ward himself, and may justly be held not to effect a change of his domicil.   And to this effect, the case of the School Directors v. James, in which the opinion of Chief Justice Gibson (from which I have quoted at so much length) was delivered, is a strong authority.   The Court maintain decidedly that, whatever may be the power of the guardian over the person and property of the ward, he cannot exercise it so as to injure the ward himself.   The very end and purpose of his office is protection, and there is no imaginable case, the Court say, in which the law makes it an instrument of injury by implication. Where the guardian acts fairly and within the scope of his authority, the ward must bear the consequences, because he must bear those risks that are incident to the management of his affairs ; but that is a different thing from burthening him with a loss as a legal consequence of the relation.   (2 Watts & Serg. 572.)   And accordingly it was held, in a suit free from fraud, that the guardian could not change the domicil, so as to subject the property of the ward to liability for taxation in the domicil of the guardian.   If the law will not permit the office of guardian to become the instrument of injury by any possible legal consequence, or implication, much less will it by the intentionally wrongful, fraudulent or unauthorised act of the guardian.   He can acquire no right by such fraudulent or unauthorised act.   But the charge of the Court made the removal of the guardian from the State of Mississippi to avoid the payment of his own debts, coupled with the fact of his failure to settle his guardianship with the Probate Court, before his removal, such a fraud, *per se*, as to prevent a change of the domicil of his ward.   And the effect of this charge cannot be said to have been effaced by the instruction given at the instance of the defendant, with the subjoined qualification. The jury were still left at liberty to find that there was no

change of domicil in contemplation of law, if the guardian left Mississippi to avoid the payment of his debts, and without settling with the Probate Court ; or if there were "other facts going to show a wrongful intent," without being informed in what the wrongful intent must consist, otherwise than as they might deduce it from the preceding portions of the charge, which, taken altogether, was not quite consistent. The jury would very naturally infer from the charge, that if the guardian had acted in fraud of his own creditors, in effecting a change of domicil, they might find that the domicil of the ward was not changed by the removal, although the conduct of the guardian may not have been fraudulent as to those entitled to succeed to the property of the ward in case of her death, or fraudulent or injurious in relation to the ward herself. As there was evidence from which the inference might be very readily drawn, that the guardian had acted fraudulently as to his creditors, the charge of the Court in this respect was calculated to mislead. Its tendency as a whole, we think, was to mislead upon this point ; and for that reason it must be held to be erroneous. The failure to account, as guardian, to the Court in Mississippi, was a circumstance which might be looked to in connexion with others, to ascertain the purpose of the guardian ; so might his after management and dealing with the property of his ward ; but his failure to give an account in Mississippi of his guardianship cannot be deemed conclusive evidence of a change of domicil purposely to defraud those entitled to the succession, or that in its consequences it was intentionally or necessarily injurious to the ward herself. Although it may be true that the guardian left Mississippi to avoid the payment of his debts, that could not be otherwise material than as showing that the primary object he had in view was not the benefit of his ward. It does not follow that there was an intention to defraud her, or those who might succeed to her rights of property, or that the removal was injurious to her. That fact and the circumstance

of the failure of the guardian to account, were not sufficient, in themselves, to prevent a change of the ward's domicil ; yet the charge. of the Court was calculated to induce that belief ·on the part of the jury ; and as it may have been the cause of their verdict, the judgment must be reversed and the cause remanded.

Reversed and remanded.

ROBERTS, J., did not sit in this case.